[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Harris,* Slip Opinion No. 2015-Ohio-166.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-166

THE STATE OF OHIO, APPELLANT, *v.* HARRIS, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Harris,* Slip Opinion No. 2015-Ohio-166.]**

*Evidence—R.C. 2945.371(J)—Mental-capacity defenses—Court-ordered mental evaluations—Allegations of malingering—When defendant asserts mental-capacity defense and then abandons it, psychologist's testimony regarding defendant's feigning of mental illness is inadmissible under R.C. 2945.371(J)—Admission of such testimony also violates defendant's right against self-incrimination guaranteed by Article I, Section 10 of the Ohio Constitution and the Fifth Amendment to the United States Constitution— Admission is not harmless error beyond a reasonable doubt.*

(No. 2013-0414—Submitted March 11, 2014—Decided January 22, 2015.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-110472, 2012-Ohio-349.

_____

**KENNEDY, J.**

{¶ 1} In this discretionary appeal from the First District Court of Appeals, we consider whether R.C. 2945.371(J) permits the state to introduce, in

its case-in-chief, the testimony of the psychologist who conducted the court-ordered evaluation on the issues of competency and sanity when the defendant asserts, but then wholly abandons, the defenses. The appellant, the state of Ohio, advances the following proposition of law: "A psychologist's trial testimony regarding a defendant's feigned mental illness during a competency and sanity evaluation is admissible under R.C. 2945.371(J) when it does not include factual evidence of guilt. It is admissible during the state's case-in-chief to show the accused's intent to mislead and defraud authorities to escape prosecution."

{¶ 2} For the reasons that follow, based on these facts, we hold that when a defendant asserts a mental-capacity defense or defenses, causing the court to order a psychiatric evaluation, but then wholly abandons that defense or defenses, a psychologist's testimony regarding the defendant's feigning of mental illness during the evaluation is inadmissible in the state's case-in-chief pursuant to R.C. 2945.371(J). We further hold that the admission of a psychologist's testimony opining on the defendant's feigning of mental illness under these circumstances violates the defendant's right against self-incrimination guaranteed by Article I, Section 10 of the Ohio Constitution and the Fifth Amendment to the United States Constitution and that the violation was not harmless error. We affirm the judgment of the court of appeals.

## I. Facts and Procedural History

{¶ 3} In late September 2010, Shane Gulleman contacted defendant-appellee, Joseph Harris, in order to purchase Oxycontin from Harris. On September 26, 2010, Shane drove from Indiana to the Winton Terrace neighborhood of Cincinnati, Ohio, to purchase the drugs. Shane's body was later discovered in his car. He had been shot multiple times. Two hundred ten dollars in cash was on the seat under Shane's body, and his wallet contained $20.

{¶ 4} On October 29, 2010, Harris was indicted for aggravated murder, murder, aggravated robbery, and having weapons under disability. Subsequently,

2

Harris filed a suggestion of incompetence to stand trial ("IST") and a plea of not guilty by reason of insanity ("NGRI").

{¶ 5} The trial court appointed the Court Clinic Forensic Services to examine Harris under R.C. 2945.371. Carla Dreyer, a clinical psychologist with the Court Clinic, evaluated Harris. She determined that Harris was competent to stand trial and that he did not meet the criteria for an NGRI plea. On February 2, 2011, the trial court filed an entry finding Harris competent to stand trial. Harris never requested an independent evaluation or a competency hearing, and he never challenged the trial court's determination.

{¶ 6} On May 12, 2011, Harris filed a notice of alibi, indicating his intention to introduce evidence that he could not have perpetrated the murder. Harris asserted that he had spent the entire day of the murder with his sister, Joeisha Harris, her children, and his sister's friend, Tasha Clayton, at Joeisha's home.

{¶ 7} During the discovery phase, Harris did not formally withdraw his NGRI plea, but on June 7, 2011, in response to the state's demand for discovery, he provided the names of the witnesses that he intended to call at trial. The witness list did not include Dreyer or any other mental-health expert. While Harris reserved the right to supplement his response, he never filed a supplemental witness list.

{¶ 8} The matter proceeded to a jury trial on June 15, 2011.

{¶ 9} The state called Dreyer as a witness in its case-in-chief. Harris objected to Dreyer being allowed to testify. In response, the state pointed out that the notice of IST had been filed and that Harris's NGRI plea was before the jury, as it had not been withdrawn. The state indicated that Dreyer was going to testify that Harris was malingering. At that time, Harris's counsel represented to the court that the defense had no intention of proceeding on any mental-capacity

theory and withdrew the suggestion of incompetence and the NGRI plea on the record at that time. The trial court overruled Harris's objection.

{¶ 10} Dreyer testified that Harris had been referred by the trial court for an evaluation of his competence to stand trial and for a determination whether he was legally insane at the time of the offense. She stated that it was her opinion that Harris was competent and that he did not meet the criteria for an NGRI plea. She also testified that when she evaluated Harris, "he was malingering both cognitive and psychiatric difficulties" and that Harris was "feigning some symptoms and probably exaggerating others." She described Harris as having antisocial personality disorder, which is characterized by "impulsivity, aggressiveness, irresponsibility, lack of regard for the rights of others, [and] lack of remorse." The state referred to this diagnosis in its closing argument and added that a person with this disorder "commits crimes."

{¶ 11} Khristina Willis and Sherron Peoples both testified that they knew Harris prior to the murder and that they saw him at or near the location of the murder when the murder occurred. Willis heard gunshots coming from the parking lot where Shane's body was found and saw Harris and another man running away from the parking lot immediately afterwards. Peoples was sitting in a car in the parking lot when Shane drove in and parked. She saw Harris get into the front passenger side of Shane's car and then she heard gunshots. Peoples saw Harris and another man run by her with guns drawn.

{¶ 12} Four inmates from the Hamilton County Justice Center testified. They described various conversations with Harris in which he had stated that he planned to rob Shane and had shot him multiple times with a .45 caliber gun. He had talked about acting like he was crazy. Harris also had stated that because the NGRI plea did not work, he was going to deny committing the murder and pin the crime on another person.

**{¶ 13}** Harris testified in his own defense. He admitted that he had met Shane in order to sell him Oxycontin pills. Harris testified that when he got in Shane's car, Shane was acting shifty and seemed to be trying to distract Harris's attention from the exchange of cash for drugs. When Shane reached into the back seat, Harris believed that Shane was reaching for a gun. Harris jumped out of the car, started shooting, and ran off.

**{¶ 14}** On June 28, 2011, the day after the jury began deliberations, the trial court filed an entry finding that Harris had withdrawn his NGRI plea before the case was submitted to the jury. On June 29, 2011, the jury found Harris guilty as charged in the indictment. The trial court merged the counts of aggravated murder and murder before sentencing.

**{¶ 15}** Harris appealed his convictions to the First District Court of Appeals. He argued that the trial court had erred when it allowed Dreyer to testify as the testimony violated his Fifth Amendment privilege against self-incrimination. *State v. Harris,* 1st Dist. Hamilton No. C-110472, 2012-Ohio-349, ¶ 19. The state countered that Dreyer's testimony did not contain any statement by Harris on the issue of guilt, but was evidence of his consciousness of guilt. The First District rejected the state's argument that Dreyer's testimony was admissible as evidence of consciousness of guilt. The court cited R.C. 2945.371(J)'s prohibition on the use of statements made by a defendant in a psychiatric evaluation against the defendant on the issue of guilt in a criminal action and concluded that evidence of consciousness of guilt is evidence of guilt itself. *Id.* at ¶ 23. The First District then applied the constitutional harmless-error standard of review and determined that the error was not harmless beyond a reasonable doubt, because Dreyer's testimony might reasonably have affected the jury's view of Harris's credibility when he testified that he had not intended to rob Shane. The court reversed Harris's convictions for aggravated murder and

aggravated robbery and remanded the cause for a new trial on those charges and accompanying specifications.

## II. Law and Analysis

### A. Bases for Harris's Mental-Health Evaluation

#### 1. Competence

{¶ 16} Consistent with the notions of fundamental fairness and due process, a criminal defendant who is incompetent may not be tried or convicted. *See Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Berry,* 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995). A defendant is presumed competent to stand trial. R.C. 2945.37(G). A defendant shall be found incompetent to stand trial only if, "after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense." *Id.*

#### 2. NGRI Plea

{¶ 17} A plea of NGRI must be made in writing. Crim.R. 11(A) and R.C. 2943.04. NGRI is an affirmative defense that must be proven by a preponderance of the evidence. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35; R.C. 2901.05(A). While the assertion of the defense is controlled by rule and statute, there is no corresponding rule or statute governing its withdrawal.

{¶ 18} Precedent demonstrates that a defendant can withdraw the defense formally, by entering a guilty or no-contest plea, by failing to pursue the defense, or by pursuing a new defense at trial. *See State v. Caudill,* 48 Ohio St.2d 342, 342-343, 358 N.E.2d 601 (1976) (written withdrawal of plea); *State v. Langenkamp,* 3d Dist. Shelby Nos. 17-07-08 and 17-08-09, 2008-Ohio-1136, ¶ 28-29 (plea of no contest); *State v. McQueeney,* 148 Ohio App.3d 606, 2002-

Ohio-3731, 774 N.E.2d 1228, ¶ 34 (guilty plea); In *State v. Monford*, the court determined that an NGRI jury instruction was not warranted, even though the defendant had not withdrawn the affirmative defense, because the evidence presented failed to support it. 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 74-76. Additionally, in *Miller v. State*, the Supreme Court of South Dakota rejected a postconviction-relief argument that the trial court failed to properly instruct the jury on the defense of insanity, concluding that the record overwhelmingly demonstrated that the NGRI plea had been abandoned to pursue a theory of not guilty by reason of justification at trial. 338 N.W.2d 673, 676-678 (S.D.1983). *See* 5 LaFave, Israel, King & Kerr, *Criminal Procedure*, Section 20.5(c), 481 (3d Ed.2007) (after entering an NGRI plea, a defendant is free to pursue another defense theory at trial).

**B.      The Fifth Amendment and Compelled Psychiatric Evaluations**

{¶ 19} Our examination of the admissibility of the psychologist Dreyer's testimony pursuant to R.C. 2945.371(J) must begin with a historical overview of the Fifth Amendment and its application to information garnered through a court-ordered psychiatric evaluation of the accused. Article I, Section 10 of the Ohio Constitution provides, "No person shall be compelled in any criminal case to be a witness against himself * * *." This language is essentially identical to the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.E.2d 653 (1964). This basic constitutional principle requires at its core that "the State * * * produce the evidence against [the defendant] by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut*, 367 U.S. 568, 581-582, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The availability of the Fifth Amendment rests "upon the nature of the statement or admission and the exposure which it invites." *In re Gault*, 387 U.S. 1, 49, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967).

{¶ 20} The United States Supreme Court has examined the applicability of the Fifth Amendment privilege against compelled self-incrimination to psychiatric evaluations. In *Estelle v. Smith*, 451 U.S. 454, 456, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the court considered "whether the prosecution's use of psychiatric testimony at the sentencing phase of [the defendant's] capital murder trial to establish his future dangerousness violated his constitutional rights." In concluding that such evidence violated the privilege against self-incrimination, the court reasoned that the "psychiatric evaluation of [the defendant was ordered] for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to [the defendant]." *Id*. at 465.

{¶ 21} Further, the court noted that the defendant had "introduced no psychiatric evidence, nor had he indicated that he might do so. Instead, the State offered information obtained from the court-ordered competency examination as affirmative evidence to persuade the jury to return a sentence of death." *Id*. at 466. It was the view of the court that under these circumstances, "[the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution * * *." At that point, "his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id*. at 467. The court concluded that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id*. at 468.

{¶ 22} In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the court examined whether the Fifth Amendment privilege was violated by the state's introduction of a psychiatric report to rebut the defendant's affirmative defense of extreme emotional disturbance. The court

recognized its acknowledgment in *Estelle* that the state may have an interest in presenting psychiatric rebuttal evidence in some circumstances. *Id*. at 422. Accordingly, the court reasoned that the holding in *Estelle* "logically leads to another proposition: If a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id*. at 422-423. The court, therefore, concluded that the introduction of the psychiatrist's general observations about the mental state of a defendant for the limited purpose of rebutting the defendant's defense of extreme emotional disturbance did not violate the Fifth Amendment. *Id*. at 424.

## C.  History and Purpose of R.C. 2945.371

{¶ 23} In 1978, the General Assembly enacted R.C. 2945.37, 2945.371, and 2945.39 to address for the first time the procedures for evaluating the mental condition of a defendant who has raised the issue of competency or entered a plea of NGRI. Am.Sub.H.B. No. 565, 137 Ohio Laws, Part II, 2943-2952. This enactment included former R.C. 2945.38(J), which prohibited the use in any criminal action of any statement made by a defendant in an evaluation for competence to stand trial on the issue of guilt. *See id.* at 2950-2951.

{¶ 24} In April 1980, the legislature amended R.C. 2945.39 to add subsection (D), which prohibited the use in any criminal action of any statement on the issue of guilt made by a defendant in an evaluation for his mental state at the time he committed the offense. Am.Sub.S.B. No. 297, 138 Ohio Laws, Part I, 991.

{¶ 25} In *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895 (1989), we considered the constitutionality and effect of R.C. 2945.39(D). Richard Cooey, charged with capital murder, entered an NGRI plea but withdrew it upon the submission of the psychiatric report. He was found guilty, and the trial court

proceeded with the penalty phase. The presentence investigation report ("PSI") that was considered by the court contained quotes from the psychiatric report.

{¶ 26} Cooey challenged the constitutionality of former R.C. 2945.39(D), arguing that by prohibiting the use of such statements only on the issue of guilt, its language implied that statements made by the defendant during the evaluation may be introduced on the issue of penalty, which, Cooey claimed, was inconsistent with the Fifth Amendment. *Id*. at 31. We found the statute constitutional, concluding that the language of (D) "distinguishes * * * between the issues of guilt—*i.e.*, factual guilt—and insanity" and, therefore, "statements made in the course of a court-ordered psychological examination may be used to refute his assertion of mental incapacity, but may not be used to show that he committed the acts constituting the offense." *Id*. at 32. We further stated that the use of the report was "limited to the issue of his mental condition." *Id*. But we concluded that the admission of certain statements in the PSI violated former R.C. 2945.39(D), as the statements went to the degree of his involvement in the crimes, i.e., his guilt, and were not admitted to rebut evidence of Cooey's psychological state. *Id*.

{¶ 27} In 1997, the General Assembly substantially expanded the procedures for evaluating the mental condition of a defendant who had raised the issue of IST or entered a plea of NGRI. Am.Sub.S.B. No. 285, 146 Ohio Laws, Part VI, 11168. R.C. 2945.39 was completely rewritten, and R.C. 2945.371(J) appeared for the first time, containing both of the formerly separate prohibitions. R.C. 2945.371(J) provides:

> No statement that a defendant makes in an evaluation or hearing under divisions (A) to (H) of this section relating to the defendant's competence to stand trial or to the defendant's mental condition at the time of the offense charged shall be used against

the defendant on the issue of guilt in any criminal action or proceeding, but, in a criminal action or proceeding, the prosecutor or defense counsel may call as a witness any person who evaluated the defendant or prepared a report pursuant to a referral under this section. Neither the appointment nor the testimony of an examiner appointed under this section precludes the prosecutor or defense counsel from calling other witnesses or presenting other evidence on competency or insanity issues.

{¶ 28} While the legislative history for R.C. 2945.371(J) is scant, the plain language of the statute strictly prohibits the use of a defendant's statements on the issue of guilt. Further, it provides the Fifth Amendment protection recognized in *Estelle*, *Buchanan*, and *Cooey*. Accordingly, R.C. 2945.371(J) also prohibits the admission of evidence from the defendant's psychiatric evaluation if the defendant neither initiates the evaluation nor attempts to introduce any psychiatric evidence.

{¶ 29} Notwithstanding these restrictions on such testimony, the statute preserves the state's right to use such testimony for other matters. *See Buchanan*, 483 U.S. at 423-424, 107 S.Ct. 2906, 97 L.Ed.2d 336 (no Fifth Amendment violation in admission of excerpts from psychological report containing general observations of examiner concerning defendant's mental state); *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 64 (no error in instructing jury that defendant's statements during psychological evaluation could be considered only on the issue of insanity and not on guilt).

D.    **Application to Harris**

{¶ 30} Prior to trial, Dreyer reported to the trial court that Harris did not meet the criteria for either incompetence or legal insanity. Harris did not request an independent evaluation or a competency hearing, nor did he challenge the trial

court's entry finding him competent. Therefore, Harris had abandoned his assertion that he was IST.

{¶ 31} Additionally, the record demonstrates that Harris had abandoned his NGRI defense after Dreyer's report. Harris filed a notice of alibi on May 12, 2011, almost a month before trial began, signaling the abandonment of the defense of NGRI in pursuit of another defense. An alibi defense, which proclaims that the defendant could not have been the perpetrator, is incompatible with an NGRI defense, which admits that he was the perpetrator of the offense, but disclaims legal responsibility.

{¶ 32} Moreover, at trial, Harris objected to Dreyer's testimony, acknowledging to the court that he did not meet the criteria for legal insanity, that he had no intention of proceeding with the defense, and that he would withdraw the NGRI plea at that time.

{¶ 33} Accordingly, the record demonstrates that Harris had abandoned his NGRI plea and would not be introducing psychiatric evidence at trial. Therefore, Dreyer's testimony regarding Harris's feigning of mental illness was inadmissible during the state's case-in-chief pursuant to R.C. 2945.371(J).

{¶ 34} We also find to be without merit the state's contention that Harris's statements are admissible in the state's case-in-chief because they do not include factual evidence of guilt, but instead are evidence of his consciousness of guilt, which, the state contends, shows his intent to mislead authorities and escape prosecution. Consciousness of guilt is no different from guilt itself. *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969), *vacated on other grounds sub nom. Eaton v. Ohio*, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972); *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997). Moreover, the state's claim that the evidence was offered not to prove guilt but to prove Harris's intent to avoid prosecution is disingenuous. The state reveals its true purpose when it argues in its brief to this court that Dreyer's testimony was relevant to

show Harris's "continuing efforts to manipulate witnesses and the court in order *to cover up his guilt in Gulleman's robbery and murder.*" (Emphasis added.)

**E.      Harmless Error**

{¶ 35} As the trial court erred in permitting Dreyer to testify, we must consider whether the admission of her testimony was harmless.

{¶ 36} Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the *government* bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." (Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In most cases, in order to be viewed as "affecting substantial rights," " 'the error must have been *prejudicial*.' (Emphasis added.)" *State v. Fischer*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *Olano* at 734. Accordingly, Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result. *State v. Morris,* ___ Ohio St.3d ___, 2014-Ohio-5052, ___ N.E.3d ___, ¶ 24-25.

{¶ 37} Recently, in *Morris,* a four-to-three decision, we examined the harmless-error rule in the context of a defendant's claim that the erroneous admission of certain evidence required a new trial. In that decision, the majority dispensed with the distinction between constitutional and nonconstitutional errors under Crim.R. 52(A). *Id.* at ¶ 22-24. In its place, the following analysis was established to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial. First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. *Id.* at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at

¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

{¶ 38} In this instance, the erroneous admission of Dreyer's testimony violated Harris's right against self-incrimination guaranteed by Article I, Section 10 of the Ohio Constitution and the Fifth Amendment to the United States Constitution. There is no question that Harris placed his state of mind at issue when he filed the suggestion of IST and entered a plea of NGRI. Nonetheless, at the time Dreyer testified in the state's case-in-chief, Harris had wholly abandoned any mental-capacity defense and was not going to be introducing any psychiatric evidence.

{¶ 39} Further, Dreyer's testimony regarding Harris's feigning of mental illness was an opinion as to Harris's credibility. Judging Harris's credibility was not Dreyer's role. *See State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 64. Additionally, her opinion that Harris lacked veracity would have caused a reasonable juror to judge Harris harshly. For example, her expert opinion that Harris was feigning mental illness could reasonably have enhanced the credibility of the jailhouse informants. More importantly, given the weight the jury would likely have assigned to Dreyer's testimony, a reasonable juror would be inclined to view with suspicion Harris's own testimony about the events surrounding the shooting and his contention that he had not intended to rob Shane. Consequently, there is a reasonable possibility that Dreyer's testimony contributed to Harris's convictions. Therefore, the erroneous admission of Dreyer's testimony had an impact on the verdict and was not harmless beyond a reasonable doubt.

{¶ 40} We next turn to a review of the strength of the remaining evidence against Harris. Willis and Peoples testified that they knew Harris prior to the murder and that they saw him at or near the location of the murder when the

14

murder occurred. Willis testified that she heard gunshots coming from the area where Shane's body was found and that she saw Harris and another man running away from the parking lot immediately after she heard the shots. Peoples testified that she was sitting in a car in the parking lot when Shane drove in and parked. She stated that she saw Harris get into the front passenger side of Shane's car. She then heard gunshots and saw Harris and another man run by her with guns drawn.

{¶ 41} Harris testified that he had met Shane on that day to sell him Oxycontin pills. Harris testified that when he entered Shane's car, Shane was acting shifty and seemed to be trying to distract Harris's attention from the exchange of cash for drugs. When Shane reached into the back seat, Harris believed that he was reaching for a gun. Harris jumped out of the car, started shooting, and ran off.

{¶ 42} Although four inmates testified that Harris had told them that he had intended to rob and did, in fact, rob Shane, other trial testimony indicated that Shane was found with $210 under his body with his wallet still in the car after the shooting.

{¶ 43} The state's only evidence of robbery was the testimony of the inmates, which directly contradicted Harris's own testimony. Therefore, the state's robbery case hinged on the jury's determination of whose testimony was more credible, the inmates' or Harris's. Because of Dreyer's improperly admitted testimony, the jury was unable to properly weigh credibility. Once Dreyer's testimony as to Harris's credibility is excised, leaving the jury with that much less of a basis for discounting Harris's denials, it cannot be said that the inmates' testimony established Harris's guilt of the robbery charge beyond a reasonable doubt.

**{¶ 44}** After applying the analysis established in *Morris,* we hold that the improper admission of Dreyer's testimony was not harmless, as it affected Harris's substantial rights. Therefore, Harris is entitled to a new trial.

### III. Conclusion

**{¶ 45}** Based on these facts, we hold that when a defendant asserts a mental-capacity defense or defenses, causing the court to order a psychiatric evaluation, but then wholly abandons that defense or defenses, a psychologist's testimony regarding the defendant's feigning of mental illness during the evaluation is inadmissible in the state's case-in-chief pursuant to R.C. 2945.371(J). We further hold that the admission of a psychologist's testimony opining on the defendant's feigning of mental illness under these circumstances violates the defendant's right against self-incrimination guaranteed by Article I, Section 10 of the Ohio Constitution and the Fifth Amendment to the United States Constitution and that the violation was not harmless error.

**{¶ 46}** The judgment of the court of appeals is affirmed.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, and O'NEILL, JJ., concur.

FRENCH, J., concurs separately.

————————————

**FRENCH, J., concurring in judgment.**

**{¶ 47}** I join the majority's conclusion that Dr. Dreyer's testimony violated Harris's constitutional right against self-incrimination and that the error was not harmless. I disagree, however, with the majority's determination that Dr. Dreyer's testimony was inadmissible under R.C. 2945.371(J). That statute prohibits the state from introducing certain statements that "*a defendant* makes in an evaluation or hearing." (Emphasis added.) In this case, the state did not introduce any statements that Harris made during his evaluation; rather, it

introduced Dr. Dreyer's opinion that Harris was feigning mental illness. In my view, R.C. 2945.371(J) simply does not apply, and the court of appeals erred by relying on it.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Judith Anton Lapp, Assistant Prosecuting Attorney, for appellant.

The Law Office of Wendy R. Calaway Co., L.P.A., and Wendy R. Callaway, for appellee.

Timothy Young, Ohio Public Defender, and Kristopher A. Haines, Assistant Public Defender, urging affirmance for amicus curiae, Ohio Public Defender.

_____