[Cite as *State v. Owens*, 2018-Ohio-4884.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27827 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2112 |
| | : | |
| RICHARD OWENS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 7th day of December, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR. by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MICHAEL MILLS, Atty. Reg. No. 0092133, 371 W. First Street, 2nd Floor, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Richard Owens appeals his conviction for one count of robbery (use of force), in violation of R.C. 2911.02(A)(3), a felony of the third degree; one count of breaking and entering (unoccupied structure), in violation of R.C. 2911.13(A), a felony of the fifth degree; and one count of assault, in violation of R.C. 2903.13(A), a misdemeanor of the first degree. Owens filed a timely notice of appeal with this Court on December 5, 2017.

{¶ 2} The record establishes that on June 28, 2017, Douglas Weng was at home alone at his farm located in Harrison Township, Montgomery County, Ohio. Weng testified that at approximately 12:00 p.m., he heard his dog begin barking just outside the house. Weng testified that he also heard a man yelling. Weng looked outside and observed a shirtless man wearing tan shorts who had a tattoo on his neck. Weng testified that he went outside to confront the man, later identified as Owens, who was yelling that "they're shooting at me" and "[t]hey want to kill me." Weng testified that Owens was sweating profusely and appeared disoriented.

{¶ 3} At this point, Weng ordered Owens to leave the property. Weng testified that he walked back through his house and exited the front door. From his new vantage point, Weng observed Owens walk toward the back side of the house and attempt to wrap himself in some shrubbery located there. Weng testified that he then observed Owens come out of the shrubbery and attempt to run across the street, whereupon he was hit by a car. Paramedics and police arrived shortly thereafter, but Owens refused treatment and left the scene. Owens provided the police with his name before he left. After leaving the scene, Owens, who admitted to having used methamphetamine that day,

testified that he walked to a nearby automobile detailing shop and called his mother to pick him up. Owens testified that his mother, Shirley Owens, arrived shortly thereafter, picked him up, and took him home. Owens testified that he and his three children from a previous relationship lived with his mother and father at their home in Harrison Township.

{¶ 4} Weng testified that, a day later on June 29, 2017, he was at home with his girlfriend, Cynthia Bowman. Bowman, who was in the backyard washing her dog, testified that she alerted Weng that she believed someone was in the barn on the property. Weng testified that he immediately grabbed a shovel and ran to the barn. Once he reached the barn, Weng testified that he recognized Owens, the man from the incident the previous day. Weng testified that Owens was standing in the barn holding a milk jug and an assortment of washing machine hoses. At that point, Owens ran out of the barn and around a large pit in the backyard, where he picked up a heavy metal plate. Owens threw the plate at Weng, striking him in the arm. Weng continued to chase Owens to the front area of the house. Once there, Owens picked up a pair of hedge trimmers and threw them at Weng, striking him in the leg. Weng testified that Owens then ran through a neighbor's yard and left the scene.

{¶ 5} Significantly, we note that Weng identified Owens as being the same man located on his property on both June 28 and June 29, 2017. Bowman also positively identified Owens as the man she observed on Weng's property on June 29, 2017. Bowman also testified that on June 29, 2017, Owens was not wearing a shirt, and she observed a tattoo on his neck.

{¶ 6} Shortly after the second incident at Weng's property, Brandy Coffman was

riding his motorcycle on a nearby roadway. As he slowed down to avoid potholes in the road, Coffman testified that he observed a man walking on the side of the road. As Coffman watched, the man ran to the other side of the road and went into the woods. When Coffman passed by the area where the man ran into the woods, the same individual stepped out from behind a tree and threw a rock or a bottle at Coffman. The object struck the motorcycle's windshield and shattered it. The broken windshield cut Coffman along the side of his head and on his hands. Coffman immediately stopped the motorcycle and yelled at the man, but he ran away. At trial, Coffman testified that the man was shirtless and sweating profusely. At trial, Coffman positively identified Owens as the man who threw the object at his motorcycle on June 29, 2017. After the incident, Coffman called 911 and then drove over to Weng's property, where he observed that the police and paramedics had already arrived. Once there, Coffman received treatment for his injuries and made a statement to police.

{¶ 7} On July 24, 2017, Owens was indicted for one count of robbery (use of force), one count of breaking and entering (unoccupied structure), and one count of assault. At his arraignment on July 27, 2017, Owens stood mute, and the trial court entered a plea of not guilty on his behalf. Furthermore, the trial court set bail at $10,000. On August 14, 2017, Owens filed a motion for reconsideration of bail; the trial court denied the motion in an entry issued on August 18, 2017. Owens filed another motion for reconsideration of bail on August 21, 2017. On September 5, 2017, the trial court granted the motion for reconsideration of bail. Owens was released on a conditional own recognizance (COR) bond, but he was confined to his parents' house on electronic home detention (EHDP).

{¶ 8} We note that the record establishes that Owens received discovery from the

State on August 7, 2017.   Accordingly, Owens had a duty to provide reciprocal discovery to the State pursuant to Crim.R. 16.

{¶ 9} A jury trial was held in this matter on October 5 and October 6, 2017, and Owens was found guilty as charged in the indictment.   The trial court ordered a presentence investigation (PSI) and scheduled the matter for sentencing.   On November 6, 2017, Owens was sentenced as follows: Count I, robbery – 18 months in prison; Count II, breaking and entering – ten months in prison; and Count III, assault – 180 days in jail. The trial court ordered the sentences to be served concurrently for an aggregate prison sentence of 18 months of imprisonment.

{¶ 10} It is from this judgment that Owens now appeals.

{¶ 11} Owens's first assignment of error is as follows:

THE TRIAL COURT ERRED IN NOT ALLOWING THE DEFENDANT-APPELLANT TO PRESENT EVIDENCE OF HIS TATTOOS AT TRIAL.

{¶ 12} In his first assignment, Owens contends that the trial court erred when it prohibited him from presenting evidence regarding the additional tattoos on his body. First, Owens argues that, because he never filed a discovery request, his reciprocal discovery obligation was never triggered.   Thus, Owens argues that he had no obligation under Crim.R. 16 to disclose the number and location of the tattoos he has on his body. Furthermore, Owens argues that even if he had a reciprocal discovery obligation, tattoos are identifying features and therefore not subject to discovery pursuant to Crim.R. 16.

{¶ 13} As previously stated, Bowman testified that the man she observed on Weng's property on June 29, 2017, had short brownish gray hair, was wearing tan shorts, had no shirt on, and had a tattoo on his neck.   On cross-examination, Bowman testified

that, although the man was running very fast when she observed him, she believed that he had a tattoo of writing on his neck. At this point, Owens's counsel asked the trial court for permission to allow Owens to untie his necktie and unbutton his collar in order to show Bowman his neck. When she was questioned after the demonstration, Bowman testified that she could only recall seeing two script tattoos on Owens's neck on the day of the incident. Bowman also testified that the tattoo she viewed on Owens's neck at trial was not exactly how she remembered it from the day of the incident. Bowman testified that she recalled that the script tattoo on Owens's neck began with a cursive "F." Weng also testified that the script tattoo on Owens's neck began with a cursive "F." When questioned as to whether she recalled seeing any other tattoos anywhere else on Owens's body, Bowman testified that she had not.

{¶ 14} Thereafter, the following exchange occurred between defense counsel, the prosecutor, and the trial court at sidebar:

Defense Counsel: I just wanted to make you aware of it before I do it, but I'm going to have the Defendant take off his shirt like the day in question because – to show, you know, what he looked like on the day in question. Because everybody says that he didn't have a shirt on.

The Court: Right now?

Defense Counsel: Yeah. Because I don't have a photo.

The Court: (Indiscernible).

Defense Counsel: Yeah, it is when you see his body. There's no way they could've seen him. He's covered in tattoos.

The Court: Oh, you see –

Defense Counsel: We've had two witnesses now testify that they have seen him on two occasions, and now this lady [Bowman] here has fine vision and she says that there were no other tattoos.

The State: I thought she said she hadn't seen any other.

Defense Counsel: Correct.

The State: That she wasn't exposed to that.

Defense Counsel: Correct.

The State: That she testified she didn't notice any other tattoos because he was running and he was running so fast.

Defense Counsel: Uh-huh.

The State: Second, this is the first I've ever heard this. We've had absolutely no notice of this. We have no photograph of his back. If I'm going to –

Defense Counsel: You know we are talking about the tattoos (indiscernible).

The State: If I am going to come to trial and use a gun in evidence, I have to show her the gun, I have to tell her about it, she has to see it. There has to be some notice. We have – this is the very first time I'm hearing this.

The Court: We don't know – right now we have no foundation that he covered himself up two weeks ago with tattoos.

Defense Counsel: (Indiscernible).

The Court: So –

Defense Counsel: (Indiscernible). She – he has one on the back of his neck and now it's –

The Court: I understand if we did discuss this at pre-trial, but just I don't think there's sufficient foundation otherwise.

Defense Counsel: I – I mean, we don't have (indiscernible) and I will have another witness testify that there's – the guy had no tattoos.

The State: Well, we don't that the next witness is testifying to it, but –

Defense Counsel: Well, yeah, (indiscernible).

* * *

The Court: So then why didn't you tell them, well, I'm going to show them a picture –

Defense Counsel: Actually, I was going to do the picture.

The Court: -- or –

Defense Counsel: I was going to have a picture of him.

The Court: -- I'm going to ask –

Defense Counsel: But we'd never know.

The Court: (Indiscernible).

Defense Counsel: We know (indiscernible) that, you know, he said that there were a number of tattoos, but you never know (indiscernible). We don't know the story. So I have a (indiscernible) to say he had tattoos. But there's no way that you can see the – like some – from what she said, from three feet away. I mean, he's covered.

The Court: Sustained.

Defense Counsel: He has them on his legs too.

The Court: Sustain the objection.

Defense Counsel: All right.

The Court: (Indiscernible).

Defense Counsel: All right. Well, (indiscernible) that means tomorrow I'll have to do it before closing.

The State: No, Your Honor. Objection. Defense counsel has had notice about what these witnesses were going to testify to since they received the police report, and at least since the preliminary hearing on, I believe it was in early June or something like that, since early June there's been discussion about the neck tattoos, and that was fine. We didn't object when she questioned him on that, but one day is completely insufficient notice.

The Court: Sustained.

Defense Counsel: But we knew that there was – remember we [sic] talking about this as far as John Plummer[1] (indiscernible) because he doesn't have any tattoos besides the one on his neck. And I said he's –

The State: (Indiscernible).

Defense Counsel: -- covered in tattoos.

The State: This is trial by surprise.

---

[1] John Plummer is an individual with a neck tattoo who also lives in the Harrison Township area. Plummer's booking photograph was not admitted into evidence at trial.

The Court: Sustained.

Tr. 235-238.

{¶ 15} The admission of evidence is within the sound discretion of the trial court. *See State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 61. We will not disturb a trial court's ruling on evidentiary issues on appeal absent an abuse of discretion and proof of material prejudice. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181; *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116. An abuse of discretion occurs if the trial court's decision is "unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 16} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *McKelton* at ¶ 144, citing Evid.R. 402 and 403(A).

{¶ 17} Courts have found evidence that a defendant has a particular tattoo to be relevant for various purposes. Tattoo evidence can be used to establish motive. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 75; *State v. Jenkins*, 4th Dist. Lawrence No. 05CA7, 2006-Ohio-2546, ¶ 53. Tattoo evidence can also be used to rebut a defendant's statements. *State v. Adams*, 12th Dist. Butler No. CA2009-11-293, 2011-Ohio-536, ¶ 35; *State v. Chisolm*, 9th Dist. Lorain No. 05CA008782, 2006-Ohio-5051, ¶ 22. Finally, as in the instant case, tattoo evidence may

be relevant to the identification of the defendant. *McKelton* at ¶ 195-196; *State v. Doan*, 12th Dist. Clinton No. CA97-12-014, 2000 WL 221963, *14 (Feb. 28, 2000).

{¶ 18} In *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), the Supreme Court upheld grand jury subpoenas ordering twenty persons to appear for voice recordings. The grand jury sought the recordings to compare with recordings of unknown voices obtained through legal wiretaps. The court held that neither the order to appear nor the order to provide voice recordings constituted a search or seizure within the meaning of the Fourth Amendment. The court held that an individual has no reasonable expectation of privacy in the sound of his voice. *Id.* at *13-14. "The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Id.* at *14. Thus, if a defendant has no reasonable expectation of privacy for certain identifying characteristics, then that same defendant has no obligation to disclose those same characteristics to the State during discovery.

{¶ 19} Upon review, we conclude that the trial court erred when it prohibited defense counsel from introducing evidence of Owens's additional tattoos on the basis of a discovery violation. Owens testified that he had approximately 26 tattoos located on his neck, arms, and legs. Owens's tattoos were not subject to discovery pursuant to Crim.R. 16. Rather, Owens's tattoos were equivalent to other identifying features such as height, weight, eye color, hair color, and skin color. The State ostensibly had the

opportunity to photograph Owens while he was in custody pursuant to standard booking procedures, and there was no evidence that defense counsel withheld or even possessed any photographs of Owens's tattoos, when she requested permission to allow Owens to remove his shirt.

{¶ 20} At trial, Owens presented an alibi defense. Specifically, he adduced evidence, in the form of his own testimony and his mother's testimony, that he was bedridden at his parents' residence on June 29, 2017, and did not leave the residence at any point during that day. Thus, Owens argued that he could not have been the man who robbed Weng and attacked him and Coffman. Weng and Bowman testified that the only tattoo they observed on Owens was located on his neck. Coffman testified that he did not recall Owens having any tattoos on his body. Therefore, the fact that Owens purportedly had approximately 26 tattoos all over various areas of his body was relevant to the witness identification of him as the perpetrator of the instant offenses.

{¶ 21} Having found error in the trial court's decision to prohibit Owens from introducing demonstrative evidence of his additional tattoos, we must determine whether said decision excluding potential impeachment evidence constituted harmless error.

{¶ 22} "[E]rror is harmless unless the substantial rights of a defendant have been affected." *State v. Harding*, 2d Dist. Montgomery No. 20801, 2006-Ohio-481, ¶ 24. The Ohio Supreme Court has recently set forth the following criteria for determining whether an error in the admission of evidence affected the defendant's substantial rights:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153,] at ¶ 25 and 27.

Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, ¶ 33.

*State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

{¶ 23} After thoroughly reviewing the entire record, we find that the trial court's decision to prohibit defense counsel from introducing demonstrative evidence of Owens's additional tattoos was harmless beyond a reasonable doubt. Initially, we note that Weng, Bowman, and Coffman all identified Owens as having short brownish, blond, gray hair, no shirt, and wearing tan shorts. While Weng and Bowman, but not Coffman, testified that Owens had a neck tattoo, the record establishes that their identification testimony was consistent with one another.

{¶ 24} We note that both Weng and Bowman testified that Owens's neck tattoo consisted of script. Weng and Bowman also testified that the script of the tattoo on Owens's neck began with a cursive "F." Evidence was adduced at trial which established that Owens did in fact have a neck tattoo in cursive script which began with an "F." In fact Owens testified himself to this fact. While Coffman testified that he did not observe any tattoos on Owens's body, the windshield on Coffman's motorcycle had just been shattered, and he was still in motion. Coffman testified that by the time he was able to stop the motorcycle and turn around, Owens had fled into the woods. Nevertheless, Coffman was still able to provide a description of the perpetrator that was consistent with the description provided by Weng and Bowman. Coffman also testified that the man who

threw the object at him had a goatee. This is consistent with Owens's mugshot in which he had a goatee. Defendant's Ex. A.

{¶ 25} Significantly, Weng was able to observe Owens on both June 28 and June 29, 2017. Weng identified Owens by his facial features and testified that he was positive that Owens was the same man that came to his house on both days. Additionally, Owens admitted during his testimony that he was present on Weng's property on June 28, 2017. Owens testified that he had attempted to purchase methamphetamine from his drug dealer in the late morning of June 28, 2017. Owens testified that his drug dealer began shooting at him, and he fled through a field eventually ending up on Weng's property. Upon being ordered off the property by Weng, Owens testified that he ran into the street and was struck by an SUV. We also note that the defendant provided the police with the name Richard Owens III after being hit by a car on June 28, 2017. Shirley Owens testified that she drove to a local car detail shop and picked up Owens after he was struck by the vehicle near Weng's house.

{¶ 26} Weng testified that the direction that Owens had entered his property on June 28, 2017, led to an area on Birch Drive in Harrison Township called Eldorado Plat. Weng testified that Eldorado Plat is known in Harrison Township for its illegal drug activity. Owens's testified that his drug dealer operated out of some type of shop located on Birch Avenue in Harrison Township. Given Owens's testimony that he was buying drugs earlier that day, the jury could have reasonably inferred that Owens came from the direction of Eldorado Plat when he entered Weng's property on June 28, 2017. Furthermore, Owens testified that he generally used methamphetamine approximately every eight hours. Eldorado Plat is near Weng's property. It would not have been

unreasonable for the jury to conclude that Owens was likely buying drugs at Eldorado Plat on June 29, 2017, when he returned to Weng's nearby property. A second reason for Owens to be back in the area was that his girlfriend was "staying" with his drug dealer. All of the eyewitnesses were able to positively identify Owens at trial as the man they observed committing the instant offenses on June 29, 2017.

{¶ 27} Lastly, we note that, although Owens was not permitted to remove his shirt in the courtroom or present photographs of his tattoos, he was still able to present some evidence regarding all of his tattoos. Owens testified that he had a tattoo on his neck that said "always forever Deanna Tara." This is consistent with Bowman and Weng describing the neck tattoo as some type of script with a cursive "F." Owens also testified that he has two tattoos on his legs. Owens testified that, in total, he had approximately 26 tattoos located on his neck, arms, and legs, and acknowledged adding another tattoo on his arm approximately six months before his trial began.[2] Furthermore, defense counsel argued in closing arguments that Weng, Bowman, and Coffmann all testified that the man who committed the offenses on June 29, 2017, did not have any body tattoos. This argument was not objected to by the State, although two of the eyewitnesses did not assert that *no* body tattoos existed, just that they did not notice any beyond the neck tattoo. Defense counsel then argued to the jury that because Owens has 26 tattoos, he could not have been the perpetrator. In light of the significant eyewitness evidence of Owens's guilt, coupled with Owens's own admissions regarding his conduct on June 28, 2017, we find that the trial court's erroneous decision to prohibit defense counsel from

---

[2] Notably, Owens did not offer any testimony regarding whether any of the 26 tattoos that he had were located on his chest and/or back.

introducing evidence of Owens's additional tattoos was harmless beyond a reasonable doubt.

{¶ 28} Owens's first assignment of error is overruled.

{¶ 29} Owens's second and final assignment of error is as follows:

THE DEFENDANT-APPELLANT WAS SUBJECT TO INEFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

{¶ 30} In his final assignment, Owens argues that his trial counsel was ineffective for: 1) failing to provide the State with reciprocal discovery including evidence of all of Owens's tattoos; or 2) failing to request a less severe sanction other than exclusion of evidence of Owens's additional tattoos. In light of our disposition with respect to Owens's first assignment of error, we need not address his argument regarding reciprocal discovery, but we will address the merits of his less-severe-sanction argument.

{¶ 31} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment

of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 32} An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶ 33} Upon review, we find no merit to Owens's argument that his trial counsel was ineffective in failing to request a less severe sanction than exclusion of demonstrative evidence of Owens's additional tattoos. Specifically, the record seems to suggest that, after being prohibited from asking Owens to take off his shirt during trial, defense counsel alluded to the use of photographs of all of Owens's tattoos, which ostensibly could have been taken after the trial concluded for the day. Defense counsel then seemed to suggest that she would enter the photographs into evidence on the next day of trial. The State objected to any alternative display on the basis that such photographs were not

provided during discovery, and it therefore did not have sufficient notice.   As previously discussed, the trial court sustained the State's objection.

**{¶ 34}** In our view, defense counsel's attempt to potentially use photographs of Owens's tattoos as evidence after being prohibited from asking Owens to take off his shirt during trial constituted a request for a less severe sanction.   Additionally, defense counsel was able to elicit testimony from Owens regarding the number (approximately 26) and location of his tattoos.   Therefore, we conclude that ineffective assistance is not demonstrated.

**{¶ 35}** Owens's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck
Sarah E. Hutnik
Michael Mills
Hon. Timothy N. O'Connell